RECORD NO. 13-4191

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KWANG HEE KIM,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

**OPENING BRIEF OF APPELLANT
KWANG HEE KIM**

Marvin D. Miller
LAW OFFICES OF MARVIN D. MILLER
1203 Duke Street
Alexandria, Virginia 22314
(703) 548-5000
katherine@marvinmilleratlaw.com

*Counsel for Appellant*                                    June 10, 2013

# TABLE OF CONTENTS

Page(s)

TABLE OF CASES, STATUTES, and AUTHORITIES........................................ iii

STATEMENT OF SUBJECT MATTER
    AND APPELLATE JURISDICTION ................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE ................................................................................2

STATEMENT OF FACTS .......................................................................................7

SUMMARY OF THE ARGUMENT ....................................................................13

ARGUMENT .........................................................................................................16

I.     A GUIDELINE ENHANCEMENT FOR POSSESSION OF A DANGEROUS
      WEAPON REQUIRES PROOF OF EXISTENCE OF SUCH A WEAPON
      DURING THE RELEVANT ILLEGAL ACTIVITY ....................................................16

      A.     STANDARD OF REVIEW ........................................................16

      B.     THE PROSECUTION DID NOT PROVE THE EXISTENCE OF A DANGEROUS
            WEAPON DURING THE RELEVANT TIME PERIOD ..................................16

II.    THERE WERE NO VULNERABLE VICTIMS ......................................................19

      A.     STANDARD OF REVIEW ........................................................19

      B.     MR. CHANG, MR. MOON, AND MR. KEE HO WERE NOT VULNERABLE
            VICTIMS...................................................................................19

III.   THE HOBBS ACT IS UNCONSTITUTIONAL UNDER THE COMMERCE
      CLAUSE WHEN APPLIED TO PROTECT CRIMINAL ACTIVITY ...........................24

      A.     STANDARD OF REVIEW ........................................................24

i

# TABLE OF CONTENTS, cont.

**Page(s)**

B.    THE FEDERAL GOVERNMENT IS PROTECTING CRIMINALS ...................25

C.    THE LOWER COURT ERRED WHEN IT BASED ITS DECISION ON
        UNITED STATES V. WILLIAMS.................................................................27

D.    THE HOBBS ACT, AS APPLIED IN THIS CASE,
        UNCONSTITUTIONALLY EXCEEDS THE LIMITS OF THE
        COMMERCE CLAUSE..............................................................................28

    1.    THE CONSTITUTION, THE PLAIN MEANING OF
                "COMMERCE",  AND THE HISTORY OF THE
                COMMERCE CLAUSE .................................................28

    2.    LIMITS OF THE COMMERCE CLAUSE:
                UNITED STATES V. LOPEZ ...........................................32

E.    THE HOBBS ACT WAS ENACTED TO COMBAT HIGHWAY
        ROBBERIES AND TO PROTECT LEGITIMATE INTERSTATE COMMERCE,
        NOT ILLEGAL INTERSTATE COMMERCE................................................34

F.     IT IS UNCONSTITUTIONAL UNDER THE COMMERCE CLAUSE TO
        GIVE MANDATORY RESTITUTION, PURSUANT TO THE HOBBS ACT,
        TO CRIMINALS FOR MONEY THEY EARNED FROM ENGAGING IN
        ILLEGAL ACTIVITY ...............................................................................36

CONCLUSION .............................................................................................37

REQUEST FOR ORAL ARGUMENT ............................................................38

CERTIFICATE OF COMPLIANCE ...............................................................39

CERTIFICATE OF SERVICE .......................................................................40

# TABLE OF CASES, STATUTES, and AUTHORITIES

<u>CASES</u>                                                                                                    **Page(s)**

*Bailey v. United States*, 516 U.S. 137 (1995) ................................................... 28, 30

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102 (1980)................................................................................. 30

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ............................. 28, 34

*United States v. Ademi*, 439 F.3d 964 (8th Cir. 2006).............................................23

*United States v. Allen*, 446 F.3d 522 (4th Cir. 2006)........................................ 16, 19

*United States v. Angle*, 230 F.3d 113 (4th Cir. 2000), vacated on
    other grounds at 254 F.3d 514 (4th Cir. 2001) ....................................... 16, 18

*United States v. Apple*, 962 F.2d 335 (4th Cir. 1992)....................................... 16, 18

*United States v. Bengali*, 11 F.3d 1207 (4th Cir. 1993)........................................ 22

*United States v. Cook*, 76 F.3d 596 (4th Cir. 1996)...............................................19

*United States v. Hickman*, 179 F.3d 230 (5th Cir. 1999)....................................... 35

*United States v. Local 807, Int'l Brotherhood of Teamsters*,
    315 U.S. 521 (1942)  .............................................................................. 34-5

*United States v. Lopez*, 514 U.S. 549 (1995)................................................. *passim*

*United States v. Manigan*, 592 F.3d 621 (4th Cir. 2012)...................................... 16

*United States v. Monsalve*, 342 Fed. Appx. 451 (11th Cir. 2009)................... 22-23

*United States v. Morrison*, 529 U.S. 598 (2000) .................................................33

*United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993),
    cert. denied, 114 S.Ct. 2714 (1994)........................................................... 19

*United States v. Williams*, 342 F.3d 350 (4th Cir. 2003) .................................. 2, 4, 27

*Xu Yong Lu v. Ashcroft*, 259 F.3d 127 (3d Cir. 2001) ............................................ 23

## FEDERAL STATUTES AND THE CONSTITUTION

18 U.S.C. § 1951 ................................................................... 1, 2, 25, 34

18 U.S.C. § 2421 et seq. ..................................................................... 25

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3663A(a)(1) ......................................................................... 36

18 U.S.C. § 3742 ...................................................................................... 1

28 U.S.C. § 1291 ...................................................................................... 1

U.S. CONST. Art. I, Sec. 8 ............................................................ 25, 28, 36

FEDERAL RULES OF CRIMINAL PROCEDURE, Rule 32 ........................................ 5, 24

U.S.S.G. § 1B1.1 Application Note 1(D) ..................................................... 5, 6, 13

U.S.S.G. § 2B1.2(b)(3)(v) ...................................................................... 17

U.S.S.G. § 2B3.2(b)(3)(A)(v) ........................................................... 1, 2, 5, 13

U.S.S.G. § 2B3.2(b)(4)(A) ................................................................... 13, 32

U.S.S.G. § 3A1.1(b)(1) ................................................................ 1, 2, 19, 23, 32

U.S.S.G. §3E1.1 ....................................................................................... 2, 13

U.S.S.G. § 5D2.21 ...................................................................................... 23

## STATE STATUTES

Va. Code §18.2-59 ..................................................................26n

Va. Code §18.2-60 ..................................................................26n

Va. Code §18.2-328 ............................................................... 22n

Va. Code §18.2-346 ................................................................22n

Va. Code §§ 18.2-355 to 357 ................................................... 22n

Va. Code § 19.2-294 ...............................................................26n

## ADDITIONAL AUTHORITIES

91 CONG. REC. 11,908 (1945)....................................................35

91 CONG. REC. 11,912 (1945).....................................................35

William W. Crosskey, *Politics and the Constitution in the History of the
      United States*, (1953) ........................................................29

THE FEDERALIST, No. 56 ...........................................................30

The Works of Alexander Hamilton, (1904), reprinting "Letter from Hamilton
      to Robert Morris" (1780) ...................................................30

Michael McGrail, *The Hobbs Act After Lopez*,
      Note, 41 B.C. L. REV. 949 (2000)...........................................35

Grant S. Nelson and Robert J. Pushaw, Jr., *Rethinking the Commerce Clause:
      Applying First Principles to Uphold Federal Commercial Regulations
      but Preserve State Control Over Social Issues*,
      85 IOWA L. REV. 1 (1999)...........................................29, 30. 31, 36

Alexander M. Parker, *Stretching Rico to the Limit and Beyond*
      Note, 45 DUKE L.J. 819 (1996)............................................. 34

Noah Webster, *An American Dictionary of the English Language*
(unpaginated ed. 1970) (1828).......................................................................30

*Webster's Contemporary American English Dictionary* (2003). ..................... 28-29

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. The judgment, conviction, and sentencing order were entered on 22 February 2013. The Notice of Appeal was timely filed on 6 March 2013. This Court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.     May a Guideline sentence be enhanced for possession of a dangerous weapon under § 2B3.2(b)(3)(A)(v) for a co-conspirator's possession of some sort of unknown and undescribed pocket knife and when that possession was not shown to have occurred while the defendant was a member of the conspiracy?

II.    Did the lower court err in applying the Guideline enhancement for vulnerable victims under § 3A1.1(b)(1) to all six victims, without making any distinctive findings as to any one of them, and applying, instead, general characteristics to immigrants from the Republic of Korea (South Korea) when the evidence in the record did not support its generalized findings?

III.   Does the Commerce Clause of the Constitution allow the Hobbs Act (18 U.S.C. § 1951) to be used to protect criminals and their criminal business activities?

IV.    Does the Commerce Clause of the Constitution allow mandatory restitution, under the Hobbs Act, to a criminal whose extorted money derived from his illegal

1

business activity?

## STATEMENT OF THE CASE

This case began with an indictment returned in the Eastern District of Virginia in Alexandria on 27 June 2012 against Han Sa Yu (aka Thunder) and his Chief Lieutenant, Je Hyung Yoo (aka Justice) for Yu's long-term extortion activities in violation of 18 U.S.C. § 1951(a) (the Hobbs Act).  As early as March 2012, prior to the June 2012 indictment, Appellant Kwang Hee Kim had been cooperating with federal authorities against Yu and his gang – the Korean Night Breeders.  Kwang Hee Kim was briefly associated with Thunder's outfit from January 2011 until he withdrew from the conspiracy in November 2011.  After his last cooperation meeting with prosecutors and agents, Kwang Hee Kim was added as a defendant to Yu's indictment in a 5 September 2012 superseding indictment charging him as a conspirator, and with two (2) substantive counts of extortion between January 2011 and November 2011.  Mr. Ki8m retained counsel and on 21 November 2012, changed his plea from not guilty to guilty of a conspiracy to violate the Hobbs Act.  There was no plea agreement.

On 22 February 2013, the court, over defense objection, calculated his Guidelines with a 2 level enhancement for vulnerable victims under § 3A1.1(b)(1), and 3 levels for possession of a weapon pursuant to § 2B3.2(b)(3)(A)(v).  Minus 3 levels for acceptance of responsibility under §3E1.1,

2

and minus 90 days for his pre-indictment cooperation, the court sentenced Mr. Kim to 60 months incarceration with three (3) years of supervised release. Upon completion of his imprisonment, he is to surrender to immigration officials for deportation. The court commented that it was unfortunate that Mr. Kim had become caught up with the Korean Night Breeders. Mr. Kim was the youngest person involved, was involved for the shortest period of time, left on his own accord, and the others did not consider him to be a full-fledged member of their outfit. (JA 164)

The court ordered $12,100.00 in restitution to be paid at $200.00 a month, beginning 60 days after commencement of supervised release. Of that sum, $ 11,600.00 was agreed to be paid to three (3) legitimate businesses (two restaurants and one flooring business). (JA 119-123) Over defense objection, the remainder was to be paid to criminals, whose money came from their criminal activities, including running prostitutes.

The court, when overruling the defense objection to the vulnerable victim enhancement under Guideline § 3A1.1(b)(1), generally found that the victims were recent illegal immigrants who did not speak English well and did not know how to navigate the legal system. There is no evidence in the record to support that finding. The "unlicensed" businesses were prostitution, illegal gambling with slot machines, and one unlicensed taxi business for "call girls".

3

While Mr. Kim was in the conspiracy, there were six (6) "victims".[1]  There is no evidence that any of them were recent immigrants, did not speak or understand English, or could not navigate the legal system.  Three (3) of the "vulnerable victims" ran sophisticated criminal enterprises, doumi, or call-girl/ prostitution operations, which also involved at least one admitted Mann Act violation.[2]  (JA 115, 124)  One ran illegal slot machines and there was an unlicensed taxi business  (JA 135, 188)  Those criminal operators cannot be described as ingénues; they fully cooperated with law enforcement, without attorneys, were not shown to be uneducated or unsophisticated, and walked away from this case with no prosecutions or tax charges despite admitting to their various criminal activities.  The other three (3) "vulnerable victims" were regular businesses conducting lawful activities.  These were Hang Gang Restaurant,

---

[1] The pre-sentence report listed all of the victims which could be discerned from the six (6) years Thunder operated his gang, but for this limited conspiracy between January and November of 2011, there were only six (6).

[2] The investigating agents, themselves, noted in their reports that doumi girls are known to engage in prostitution.  (JA 124)  One of the doumi operators, Mr. Chang, acknowledged that his girls engaged in prostitution and even admitted he brought a young woman with a student visa from Seattle, Washington to Virginia to work for him.  (JA 115, 124)  The prosecution did not object to or deny the nature of the "doumi" operations was involving prostitution.  Chang  (YSC) was a citizen and ran two (2) doumi – "CoCo" and "Romance"  (JA 188) .  Moon (ISM) was an illegal alien and ran "Kiss" doumi and an illegal taxi business (JA 188).  Kee Ho (KHY) ran "Ace" doumi (JA 188).  None were shown to be recent immigrants, nor to be unsophisticated or vulnerable.

4

Honey Pig Restaurant and Mr. Oh's flooring business. Like the criminal "victims", these legitimate businesses were not shown to be operated by uneducated, low level, untrained laborers. Not all of the victims were illegal and none were recent immigrants, but the court made no findings about any one of them; rather, they were lumped together as if all were the same.

When the court read its pre-prepared sentencing decision into the record at the end of the hearing, it treated all of the "victims," regardless of their sophistication, experience, and education, as *per se* vulnerable victims. (JA 147-149) No distinction was made as to any individual "victim". Who was found to be deficient in English or unknowlegeable about our system or who was a recent and who was illegal or who ran what unlicensed business was not stated. There was no Rule 32(i)(3)(B) F.R.Crim.P. decision.

The defense objected to an enhancement of three (3) levels for possession of a dangerous weapon under Guideline §§ 2B3.2(b)(3)(A)(v) and 1B1.1 Application Note 1(D). The claimed justification for this enhancement was that one co-defendant, Justice, allegedly carried some sort of undescribed pocket knife when extortions were being perpetrated. The defense objection was based on the fact that the claimed victims during Mr. Kim's January to November 2011 conspiracy did not mention in their prosecution interviews anything about a weapon, let alone a pocket knife, being possessed or used. They knew nothing about it.

5

The prosecution did not describe or introduce the knife into evidence; it is unknown whether it was a Swiss Army knife with a tiny blade or something else. The record is silent. (JA 135-138) The prosecution argued that co-conspirator Justice's "past history of carrying a weapon", which occurred prior to Mr. Kim's entry into the conspiracy, was enough for the enhancement. (JA 138) Mr. Kim, the defense argued, may not be sentenced on conduct that did not occur when he was in the conspiracy. Even if Mr. Kim knew Justice possessed some sort of pocket knife, the defense position was that the prosecution still had to prove when Justice carried the knife, and that it was a dangerous weapon capable of inflicting death or serious bodily injury per Guideline § 1B1.1 Application Note 1(D). The prosecution failed to present any evidence to support a claim of a dangerous weapon. The court applied the enhancement.

The defense also objected to the application of the Commerce Clause through the Hobbs Act to protect businesses engaged in criminal activities. The court relied on *United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003), to find that the Hobbs Act applied to protect illegal criminal activity, yet that issue was not raised or addressed by this Court in *Williams*. (JA 147) The lower court and the prosecution did not rely on any case that addressed the defendant's objection that the Commerce Clause, under the Hobbs Act, may not be applied, as occurred here, to protect crime such as Moon's Chang's and Kee Ho's criminal enterprises. In

other words, the defense premise was, and is, that a person who extorts a pimp is not interfering with the sort of interstate commerce (*i.e.*, legal interstate commerce) that the Constitution empowered Congress to protect for the welfare of the American people, and that prosecution of this type of extortion is best left to the police powers of the states. It is outside of the jurisdiction of the federal law.

The defense objections at sentencing to enhancements for possession of a dangerous weapon by Justice, vulnerable victims and application of the Hobbs Act to protect criminals were denied. The notice of appeal was timely filed. After the grant of a five-day extension, this brief is timely filed.

## STATEMENT OF FACTS

This case covers the brief period of time (January 2011 to November 2011) when Kwang Hee Kim was a member of a group, known as the Korean Night Breeders, which existed for approximately six (6) years. That outfit was created by Han Sa Yu, aka Thunder, in 2006 and continued in operation until June 2012. (JA 24-26) One of Thunder's chief lieutenants, Je Hyung Yoo, aka Justice, introduced Kwang Hee Kim to Thunder. (JA 183) In January 2011, Mr. Kim joined in with the Korean Night Breeders. He left the conspiracy in November 2011. (JA 25) Before January 2011 and after November 2011, Mr. Kim was not involved in their activities. He withdrew from the conspiracy before any charges were brought against him and before he was under any known threat of

prosecution.

In March 2012, months before the June indictment of Thunder and Justice, Mr. Kim began cooperating with federal authorities in their investigation of Thunder's activities. Mr. Kim did not have defense counsel during the various interviews conducted by federal agents and the prosecution between March 2012 and his ultimate indictment on 5 September 2012.

During Mr. Kim's involvement, there were six (6) targets of Thunder's operation. Only three (3) of the six (6) "victims" were in the agreed Statement of Facts at the guilty plea. These were Honey Pig Restaurant; YSC, (aka Mr. Chang), who operated the CoCo and Romance doumi call-girl/prostitution operations; and, KHY, (aka Mr. Kee Ho), who operated the Ace doumi operation and illegal slot machines at the Limelight Restaurant. (JA 25) Nonetheless, at sentencing, the defense agreed that three (3) of the six (6) targets were legitimate businesses and victims who were entitled to restitution: (1) Hang Gang Restaurant, at $2,000.00, (JA 111, 114, 120); (2) Honey Pig Restaurant, at $8,600.00, (JA 94, 113, 120); and, (3) Mr. Oh's flooring business, at $500.00. (JA 43, 105, 106, 111) These three were engaged in lawful business activities and substantiated the conviction for Count 1 as well as a restitution order in the amounts indicated.

Aside from the Guideline errors, a critical issue in Mr. Kim's case concerns the other three (3) "victims" alleged by the prosecution who were all engaged in

illegal activity. These criminal "victims" were ISM (aka Mr. Moon), Mr. Kee Ho, and Mr. Chang.

Mr. Moon ran two illegal businesses. The first was an illegal taxi operation, and the second was a doumi call-girl/prostitution operation called Kiss. (JA 135, 186, 188) Kiss doumi employed illegal aliens and exploited them as doumi call-girls. (JA 135) Mr. Moon's illegal taxi business defrauded the county, state, and federal government out of tax dollars, which is separate and apart from his illegal doumi business. Thunder targeted Mr. Moon, according to the Pre-Sentence Report, because he was a criminal making money from his illegal activities. (JA 135, 186)

Mr. Moon's only contact with the conspiracy during the timeframe of Mr. Kim's involvement was a single incident in April 2011. (JA 99) According to both Mr. Moon and Thunder, Thunder ran into Mr. Moon by chance in Vienna, Virginia, in April 2011. (JA 92) Mr. Moon told the prosecution he gave Thunder $1,000.00, which contradicted his statements to the agents that Thunder collected $500.00. He also stated that the April 2011 event was the only one that year. (JA 92, 99-100) Ms. Kim, Moon's girlfriend told investigators she gave Moon the $500.00 to pay Thunder. (JA 92, 99-100) Additionally, the $500.00 amount is consistent with Thunder's post-guilty plea debriefing to the investigators and prosecution. (JA 92) Neither Mr. Kim nor Justice was present during the April

9

2011 encounter.

There is a conflict about an incident Moon claimed occurred in September 2011, when Mr. Moon said he gave $1500.00 to Thunder. According to the investigators' report, Thunder did not mention that event to the prosecution in his debriefing pursuant to his cooperation agreement. (JA 101-102) Ultimately, the parties agreed that the actual restitution amount owed to Mr. Moon, if he is constitutionally covered by the Hobbs Act, was $500.00 for April 2011, not the $500.00 plus the $1,500.00. (JA 119-120)  The September 2011 claim was discarded.

Mr. Chang, a United States citizen, admitted that some of his doumi girls engaged in prostitution, confirming what the prosecution's investigation agents reported about doumi businesses being prostitution operations. (JA 123-124) Mr. Chang also admitted that he brought a young woman, who was in the United States on a student visa, from Seattle, Washington to Annandale, Virginia, to have her work for him illegally as one of his doumi girls. (JA 115) That was a violation of the Mann Act. Mr. Chang admitted that the exploited illegal aliens. (JA 115, 123, 124)

Interestingly, Mr. Chang told the prosecution in his interviews with agents, that despite being engaged in illegal activity, he paid Thunder money in order to help Thunder. Mr. Chang stated he was not scared of Thunder, and did not give

10

him money out of fear.  (JA 123)  If this is so, his payment was not extortion.

However, there are conflicting reports as to whether Mr. Chang voluntarily or

involuntarily gave money to Thunder.  As the prosecution indicated, these issues,

as well as the amount Mr. Chang gave Thunder, were in dispute at sentencing.  (JA

120)  The court never expressly ruled on the issue of voluntary versus involuntary

contributions.  The court's credibility determinations were based on two

conflicting reports by Mr. Chang.  The court ultimately accepted the statement that

favored the prosecution rather than the one which favored the defense, without

listening to live witness testimony to determine which was true.  In the end, the

court apparently found the payments involuntary because it ordered restitution to

Mr. Chang for the money he gave to Thunder, thereby using the Commerce Clause

to protect and support Mr. Chang's doumi, call-girl/prostitution business.

Mr. Kee Ho told the government in his cooperation interviews that the last

time he gave any money to Thunder was 2010, which was outside of this

conspiracy.  (JA 92)  Ultimately, the parties agreed to strike from the restitution

order the $240.00 restitution the government had claimed for his doumi, call-

girl/prostitution business.  (JA 121)  Mr. Kee Ho operated a doumi business known

as Ace.  (JA 188)  He also ran illegal slot machines in a restaurant he operated

called the Limelight.  (JA 135)  The Limelight is duly licensed, except for its

illegal gambling operation.  Whether he was included as a vulnerable victim is not

11

known because the lower court did not identify who of those the defense contested, it found to be vulnerable.  (JA 1457-149)

The government's reports of its investigation interviews with each of the individual "victims" during the time frame of Mr. Kim's involvement in the conspiracy do not mention the use of any kind of weapon, baton, or knife.  It is also important to note that not one of the cooperating co-defendants claimed, in any post plea debriefing, that any weapon, knife, or baton was used or displayed to any target between January and November 2011.  (JA 91-92, 97, 138)  Although Thunder claimed that Justice carried a pocket knife, he did not say when, and he did not describe it.  (JA 98)  He did claim that Mr. Kim was aware that Justice carried some sort of pocket knife; however, Mr. Kim, in his pre-indictment interviews with the prosecution, said that although he saw a baton, he never saw it outside of Justice's apartment, and he never mentioned anything about Justice carrying any kind of knife or dangerous weapon.  Justice, in his interviews with the prosecution, also said nothing about carrying or possessing a knife, a pocket knife, a baton, or any dangerous weapon in relation to extortion during the timeframe that Mr. Kim was in the conspiracy.  Justice had a cooperation agreement, but was not called by the prosecution to testify about possessing a dangerous weapon during the relevant times.  The best justification the prosecution could offer to the court for the deadly weapon enhancement was that it was, ". . . based, if nothing else, on

12

the past history of [Justice] carrying the weapon [an unknown pocket knife of some sort]." (JA 138) There is no evidence identifying or describing a "dangerous weapon". (JA 139) A pocket knife that folds closed is not a dangerous weapon as defined by Guideline § 1B1.1 Application Note 1(D).

Adding the vulnerable victim enhancement of 2 levels and the dangerous weapon enhancement of 3 levels, along with his other adjustments, such as Thunder slapping Moon in April 2011, (Guideline § 2B.3.2(b)(4)(A)), and a criminal history of II, led to a Guideline level of 28, which is 87 to 108 months. Deducting 3 levels for acceptance of responsibility under Guideline § 3E1.1 led to a level 25, which is 63 to 78 months. Finally, deducting 90 days from his pre-indictment cooperation resulted in Mr. Kim's 60 month sentence.

## SUMMARY OF THE ARGUMENT

In this case, a man known as Thunder, started a gang involved in extortion, which he operated from 2006 until June 2012. One of the members, and his chief lieutenant, from 2009 until 2012, was Justice. Justice knew Kwang Hee Kim from the Korean community in Northern Virginia, and introduced him to Thunder. Mr. Kim associated with Thunder's gang from January 2011 until November 2011. The gang did not trust Mr. Kim, considered him weak, did not want him to speak when they were trying to intimidate people because he sounded too much like a girl, and as the trial court found, the gang did not consider him to be a full-fledged

13

member of their group.

During the timeframe of Mr. Kim's conspiracy, there were six victims. Three of the victims were businesses engaged in lawful activity (two restaurants and a flooring business), and the other three were criminals engaged in illegal activity (prostitution, gambling, and tax fraud). Those who admitted to conducting criminal enterprises faced no prosecutions. Not all of the victims had been in this country for the same length of time. Some were illegally here, and some were not. All ran businesses, whether illegal or legal, and none were shown to be unsophisticated. Despite the fact that each of the six had different characteristics and circumstances, the court made no individual findings as to any one of them, but lumped them together based on findings of general characteristics it said applied to immigrants. Its finding of vulnerable victims had no factual support in the record.

During the prosecution's interviews with the victims, none reported knowing about, seeing, or being aware of any weapon in the incidents in which they were involved with Thunder between January and November 2011. Two of Mr. Kim's co-defendants, Thunder and Kang, said in their debriefings pursuant to their cooperation plea-agreements, that Justice carried some sort of pocket knife during extortions, and that Mr. Kim knew about it. The only description of the knife was that it folded closed, but its size or shape is unknown. Neither it, nor a photograph,

14

nor a description, were placed in evidence. No witnesses were called to describe it, and no victim knew anything about any kind of weapon during the relevant time frame of this case. Nobody, including Justice, also a cooperating co-defendant, testified that any deadly weapons were possessed during the relevant timeframe in this case; indeed, the prosecution argued for the enhancement because of what Justice reportedly did in the past, before Mr. Kim's limited involvement with the gang.

Finally, this case presents a matter of first impression in this Court. This Court is being asked to decide whether the limited authority granted to the National Government under the Commerce Clause includes using the Hobbs Act to protect criminal enterprises. The Hobbs Act relies on Commerce Clause power to allow federal prosecution of extortion if it interferes with interstate commerce. According to the Constitution, the Commerce Clause is intended to authorize the National Government to protect commerce for the welfare of the nation. In this case, the government used the Hobbs Act to prosecute the extortion of criminals engaged in illegal activity, principally prostitution, which the government claimed was in interstate commerce. Protecting prostitution is not in the national interest, and is, therefore, outside of the scope of the Commerce Clause. Prior cases have only addressed whether illegal activity, such as selling drugs or prostitution, was in interstate commerce, not whether the Commerce Clause power could be used to

15

protect such criminal activity. These kinds of prosecutions should be left to the police powers of the states.

## ARGUMENT

**I.    A GUIDELINE ENHANCEMENT FOR POSSESSION OF A DANGEROUS WEAPON REQUIRES PROOF OF EXISTENCE OF SUCH A WEAPON DURING THE RELEVANT ILLEGAL ACTIVITY.**

### A.    STANDARD OF REVIEW.

In assessing whether a court has properly applied Federal Sentencing Guidelines, factual findings are reviewed for clear error and legal conclusions *de novo*. *United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006).

### B.    THE PROSECUTION DID NOT PROVE THE EXISTENCE OF A DANGEROUS WEAPON DURING THE RELEVANT TIME PERIOD.

It is the prosecution's burden to establish facts justifying a sentencing enhancement it seeks. *United States v. Angle*, 230 F.3d 113, 125 (4th Cir. 2000), vacated on other grounds at 254 F.3d 514 (4th Cir. 2001); *United States v. Manigan*, 592 F.3d 621, 630 (4th Cir. 2012). In order to establish a weapon enhancement, the government must prove that the weapon was possessed during the relevant illegal activity. *United States v. Apple*, 962 F.2d 335, 338 (4th Cir. 1992). The government failed to do so in this case.

The Pre-Sentence Report in ¶15 indicated that Justice would sometimes carry or brandish some sort of knife or a metal baton when extorting victims.

16

(JA 184)  Under Guideline § 2B1.2(b)(3)(v), this increases the Guidelines three (3) levels, which the court applied to Mr. Kim.  (JA 272)  While the original allegation in the pre-sentence report concerned both a metal baton and a pocket knife, the issue at sentencing focused on an unknown, undescribed pocket knife.  The metal baton had been used at the Gom Tang E Restaurant in 2010, but Mr. Kim was not a member of the conspiracy then, and told the investigators and prosecutor in his interviews that he never saw the baton other than inside Justice's apartment. (JA 91, 136-137)  None of the victims or co-conspirators alleged that they saw or used a baton for anything between January 2011 and November 2011. (JA 91-92)

At sentencing, the defense raised the objection that, according to the government's investigation reports, no individual during the victim interviews with investigators had mentioned anything knowing about a knife, or one being seen or used, for the January to November 2011 timeframe.  (JA 92, 222)  The prosecution's response to the defense's objection to the enhancement for lack of evidence, did not dispute their reports; rather it was that, if based on nothing else, the enhancement should apply because co-conspirator Justice had a past history of carrying it.  (JA 137-138)  The prosecution also said that Thunder claimed that Mr. Kim knew that Justice carried some undescribed knife during extortions and that co-defendant Mr. Kang had said the same thing.  (JA 139)  Contrary to established case law that the government must prove that the weapon was possessed during the

17

relevant illegal activity, the prosecution did not offer any evidence as to when Justice carried this nondescript knife. *Apple*, 962 F.2d at 338. No time frame was set by their witnesses. They had been together long before Mr. Kim was associated with them. (JA 183)

The prosecution ended its argument by observing that there was no evidence that the knife was not possessed by Justice during the time period Mr. Kim was in the conspiracy. This reasoning is invalid because the burden is on the prosecution, not the defense, to establish facts justifying an enhancement. *Angle*, 230 F.3d at 125.

In addition, a weapon has to be a "dangerous weapon" as defined by § 1B1.1 Application Note 1(D) of the Guidelines in order to apply the "dangerous weapon" enhancement. As the defense objected to the court at sentencing, there is no evidence of what it was, and there is no description of it. (JA 139, 146) The prosecution did not show that the pocket knife was a dangerous weapon capable of inflicting death or serious bodily injury. (JA 139) Pocket knives fold closed, come in different sizes, and have various types of blades with differing lengths. (JA 140) The prosecution never made a proffer and did not produce a photograph, report or witness testimony that would justify a finding that this pocket knife, whatever it was, could inflict death or serious bodily injury. That failure, without more, is sufficient to deny application of the enhancement. The party urging an

18

enhancement has the duty of providing the proof to make it apply.  Where sentencing evidence is uncertain, courts should err on the side of caution.  *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993), cert. denied, 114 S.Ct. 2714 (1994), cited with approval *United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996).  The enhancement should be stripped from the Guideline calculation and the case resentenced without it.

## II.   THERE WERE NO VULNERABLE VICTIMS.

### A.   STANDARD OF REVIEW.

In assessing whether a court has properly applied Federal Sentencing Guidelines, factual findings are reviewed for clear error and legal conclusions *de novo*.  *United States v. Allen*, 446 F.3d 522, 527 (4th Cir. 2006).

### B.   MR. CHANG, MR. MOON, AND MR. KEE HO WERE NOT VULNERABLE VICTIMS.

At sentencing, the court stated it was going to adopt the finding on vulnerable victims it made for the other defendants.  (JA 133)  The other defendants, however, did not object to the vulnerable enhancement under § 3A1.1(b)(1) of the Guidelines.  Their plea agreements about what they considered an acceptable Guideline enhancement for their much longer and wider-ranging conspiracy cannot bind Mr. Kim in his brief, narrow conspiracy.  The facts

of the conspiracy do not justify the enhancement for his case.[3]  Their cases are not

his case, and their agreements on their facts are not his.  The other defendants'

agreements, agreed statement of facts, full pre-sentence reports, sentencing

memoranda, and sentencing positions, are not in this record.  Mr. Kim is entitled to

his own sentencing for his own case and his brief involvement.

        The court, in its vulnerable victim finding, made generalizations and did not

make specific findings.  The court tended to treat the six individual "victims" as a

group which shared the same characteristics. The court stated that some "victims"

operated unlicensed businesses, but not who nor which business.  This is not

consistent with the record because the two restaurants and the flooring business

were not shown to be unlicensed or engaged in criminal activity.  However, the

three prostitution operations of Mr. Chang, Mr. Moon and Mr. Kee Ho, the illegal

gambling operations of Mr. Chang, and the illegal taxi operation of Mr. Moon,

were not merely unlicensed; they were flat out criminal enterprises.  The court also

stated that some of the victims were illegally in the United States, but failed to

identify who it so found.  These illegal persons might be Mr. Kee Ho, Mr. Moon,

and Mr. Oh, but the defense does not know because the court did not make a

---

[3] The Pre-Sentence Report puts Thunder, Justice and Kang in a conspiracy for 2009 until
2012.  (JA 183)  Mr. Kim was only in the conspiracy from January 2011 until November 2011.
(JA 24)  The PSR claim as to Mr. Kim being in as long as the others was, by agreement of the
Parties, rejected by the trial court.  (JA 127)

20

finding as to who was here illegally.  (JA 148)  Mr. Chang and those owning and

operating the Hang Gang and Honey Pig restaurants are legally in the United States

and were not shown to be otherwise.  The court also found that some of these

individuals did not speak English well, but yet again, the record does not show to

whom the court referred, nor is there any evidence in the record that these victims

have poor English language skills, which makes them "vulnerable".  (JA 149)

   The court concluded by finding that the victims lacked an understanding or

ability to navigate the American law enforcement systems, and feared legal

repercussions, making them particularly susceptible to extortion.  (JA 149)

 However, the record does not support such a finding, and instead supports the

opposite conclusion, *i.e.*, that these "victims" were sophisticated and savvy.  The

criminal "victims" had been successfully operating, and profiting, from their

prostitution businesses for some period of time without being caught or prosecuted

by either the local or federal law enforcement system.  There is no claim or

evidence that the two restaurants and flooring business were struggling,

unsuccessful, or vulnerable.  All of these business owners, legal and illegal,

navigated the legal system quite well.  Neither the federal nor state governments

prosecuted any of them, even after the criminals confessed to their illegal activity.

Running a prostitution business is unlawful in the Commonwealth of Virginia, as is

running unlicensed taxi or gambling operations, and not paying local, state, or

federal taxes.[4]   Moreover, these men were able to convince the prosecution to have a federal judge order restitution to them of the money they obtained from their criminal activities.  They are not "vulnerable victims."

All of the cases the court claimed justified application of the vulnerable victim enhancement to Mr. Kim are clearly distinguishable from this case and/or address unrelated issues.  (JA 149-50).  In *United States v. Bengali*, 11 F.3d 1207, 1212 (4th Cir. 1993), the evidence established, and this Court found, that the victim was a recent immigrant of six months, and that because there was rampant corruption in the victim's country of origin, he distrusted the American judicial system and did not immediately turn to authorities for help.  Here, there was no evidence in the record that any of the "vulnerable victims" were recent immigrants, or that the South Korean government or judicial system suffers from corruption causing them fear and distrust of the government of the United States.

In the unpublished case from the Eleventh Circuit, *United States v. Monsalve*, 342 Fed. Appx. 451, 458 (11th Cir. 2009), the defendants smuggled two women into the country promising them legitimate work, but instead forced them into prostitution, threatening them with deportation.  In Mr. Kim's case, the government is protecting pimps.  (JA 115, 124, 188)    The court in *Monsalve*

---

[4]  *See* Va. Code §§18.2-346, 18.2-355 to 357, making it illegal to prostitute or run a prostitution business.  *See also* Va. Code §18.2-328, making it illegal to conduct an illegal gambling operation.

emphasized that the victims were not vulnerable *per se* due to their illegal alien status, but rather relied on facts in evidence which proved they had no income for basic necessities, spoke no English, had no family in the US, and had no other place to live other than what was provided by their captors. 342 Fed. Appx. at 458. In Mr. Kim's case, there is no evidence of vulnerability. To the contrary, the "victims" were sophisticated businesses or businessmen with family or friends in the United States. Some of the "victims" had enough power in their community to victimize others – i.e. exploit women by using them as prostitutes.

When reading its sentencing decision into the record, the lower court also cited to *United States v. Ademi*, 439 F.3d 964, 967 (8th Cir. 2006), but that case did not even involve a vulnerable victim enhancement under § 3A1.1(b)(1). (JA 149) The lower court in *Ademi* had enhanced the defendant's sentence under a § 5D2.21 departure analysis because that defendant physically beat his employee, who was a "vulnerable" illegal alien, and injured him and threatened him with a knife when he wanted to be paid for his work. 439 F.3d at 967. Finally, in *Xu Yong Lu v. Ashcroft*, 259 F.3d 127, 132 (3d Cir. 2001), the petitioner was one of many escaping persecution from China on the Golden Venture, the well-known ship that ran aground with its Chinese refugees near the shores of New York City in 1993. (JA 149) The Chinese had fled to the United States to seek political asylum. The court in *Xu Yong Lu*, relying on facts in evidence, noted that because illegal aliens

23

often do not speak English well and are unfamiliar with American laws, they are vulnerable to being represented by inadequate counsel in deportation proceedings when, as there, their efforts to gain entry and asylum were rejected. 259 F.3d at 132. An inadequate counsel claim for a fresh immigrant seeking entry to the United States has nothing to do with a vulnerable victim enhancement in a case such as this.

There is no evidence that any of the "victims" in this case could not speak English well or that they were unfamiliar with the American legal system or were shown to be recent immigrants. There were no cases on which the trial court relied and no evidence presented by the prosecution sustaining a vulnerable victim enhancement for Mr. Kim's sentence. The trial court lumped all of the six "victims" together as a class, but each "victim" had differing facts and characteristics. There were no individual findings on the defense objections under Rule 32(i)(3)(B) This enhancement should be stripped from the Guideline calculation and the case sentenced without it.

## III. THE HOBBS ACT IS UNCONSTITUTIONAL UNDER THE COMMERCE CLAUSE WHEN APPLIED TO PROTECT CRIMINAL ACTIVITY.

### A. STANDARD OF REVIEW.

The standard of review for the constitutionality of a statute as applied is *de novo*. *United States v. Lopez*, 514 U.S. 549 (1995).

**B.    THE FEDERAL GOVERNMENT IS PROTECTING CRIMINALS.**

The Hobbs Act provides in part:

> Whoever in any way or degree obstructs, delays, or <u>affects commerce or the movement of any article or commodity in commerce</u>, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section [shall be punished].  (emphasis added). 18 U.S.C. § 1951(a) (2012).

The Hobbs Act, as applied to Mr. Kim's case, is unconstitutional because the government used the Hobbs Act's jurisdictional hook, that extortion must <u>affect interstate commerce</u>, to protect criminal activity.  This exceeds Congress' limited power under the Commerce Clause.  U.S. CONST. Art. I, Sec. 8.  In this case, the government prosecuted Mr. Kim for involvement in extortion.  Three of the so-called "victims" ran prostitution businesses (called doumi in the South Korean culture), one of whom transported a young woman across state lines in violation of the Mann Act.[5]  (JA 123-124, 149)  These businesses employed and exploited illegal immigrants.  (JA 115, 123-24, 135, 188, 214).  The government ignored these illegal activities and simply focused on the fact that because a prostitution business was "engaged in interstate commerce", Mr. Kim violated the Hobbs Act by participating in the conspiracy to take their money.  The question is not whether

---

[5] The Mann Act, 18 U.S.C. § 2421 et seq., prohibits transporting women across state lines for prostitution.

25

prostitution affects interstate commerce, but whether using the Commerce Clause to protect such criminal interstate commerce is constitutional.

By choosing to prosecute Mr. Kim federally rather than allowing state prosecution, the federal government protected criminal activity, which is beyond the purpose and scope of the Commerce Clause. A state prosecution would be based on the principle that one person may not steal from another, regardless of whether the victim is a criminal or not.[6] In contrast, in a Hobbs Act case, the federal government invokes the Commerce Clause's purpose to protect interstate commerce for the public welfare in order to exercise jurisdiction to prosecute. However, the public welfare is not protected or promoted by prosecuting extortion in the name of protecting pimps. As such, the government violated the Commerce Clause when it used the Hobbs Act to prosecute Mr. Kim for the extortions of Mr. Chang, Mr. Kee Ho, and Mr. Moon because their money came from their illegal, criminal businesses (the doumi, call girl/prostitution businesses, the illegal gambling business, and the illegal taxi business). (JA 115, 121, 123-24, 135, 186, 188, 214)

---

[6] Va. Code §§ 18.2-59 and 18.2-60 make it a crime to commit extortion without regard to interstate commerce. *See also* Va. Code § 19.2-294, which bars state prosecution once there has been a federal prosecution for the same act.

## C. THE JUDGE ERRED WHEN HE BASED HIS DECISION ON *UNITED STATES V. WILLIAMS*.

At sentencing, the lower court discounted Mr. Kim's argument that the Hobbs Act, as applied to him in this case, violated the Commerce Clause by relying on this Court's prior decision in *United States v. Williams*, 342 F.3d 350 (4th Cir. 2003). (JA 147) However, that case did not raise or address Mr. Kim's argument. In *Williams*, the appellant robbed and killed a drug dealer and was convicted of a Hobbs Act robbery. On appeal, Williams argued that his robbery "failed to affect interstate commerce" because there was insufficient evidence to prove the victim was dealing drugs when he was robbed and murdered. *Id.* at 353-54. This Court affirmed the lower court because, under the issue presented in that case, there was enough evidence for the jury to have decided that the stolen cash represented proceeds from the victim's drug dealing, which affected interstate commerce. *Id.* at 355. Unlike Mr. Kim, *Williams* did not raise the issue of whether protecting a drug dealer's illegal assets is what the Founding Fathers intended for the Commerce Clause; therefore, the Hobbs Act cannot be so applied. The lower court erred by relying, as the basis of its decision, on a case that did not address the issue raised by Mr. Kim.

27

**D.** **THE HOBBS ACT, AS APPLIED IN THIS CASE, UNCONSTITUTIONALLY EXCEEDS THE LIMITS OF THE COMMERCE CLAUSE.**

**1.** **THE CONSTITUTION, THE PLAIN MEANING OF "COMMERCE", AND THE HISTORY OF THE COMMERCE CLAUSE.**

The Supreme Court has declared that the task of courts, when interpreting statutes, is "to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)); *see also, Bailey v. United States*, 516 U.S. 137, 144-45 (1995). The plain meaning of "commerce" does not include <u>illegal</u> business activity.

The Constitution vested Congress with three main powers: taxing, spending and commerce. U.S. CONST. Art. I, Sec. 8. Under the commerce power, Congress may regulate commerce "among the several States", (*i.e.*, interstate commerce), commerce with foreign nations, and commerce with Native American Tribes. *Id.* The Constitution states that while Congress may adopt all laws that are "necessary and proper" to exercise its authority, Congress must use its power to provide for the "<u>general welfare</u> of the Unites States." (emphasis added); *Id.* "Welfare" is defined in Webster's Dictionary as "the state of doing well esp. in respect to happiness, well-being, or prosperity". WEBSTER'S CONTEMPORARY AMERICAN

ENGLISH DICTIONARY, 599 (2003).[7]  Considering this definition, a federal

government that protects criminal business, such as occurred here, is not consistent

with the limited powers given to Congress by the Commerce Clause because it

does not increase the well-being or happiness of the general population.  Protecting

financial gain that depends on human rights violations does not enhance the

general prosperity of this country, and is likewise outside of the scope of

Congressional power.  The federal government does not have general police

power.  That is left to the states' actions, such as this prosecution, which exceeds

the National Government's enumerated powers, undermines the sovereignty of the

states.  *United States v. Lopez, supra.*, at 564.

At the time the Constitution was enacted, the understanding of the word

"commerce" did not include illegitimate activity.  The 18th century colonists' usage

of "commerce" encompassed not merely the buying and selling of goods, but also

labor-wage transactions and other services, such as insurance.  Grant S. Nelson and

Robert J. Pushaw, Jr., *Rethinking the Commerce Clause: Applying First Principles*

*to Uphold Federal Commercial Regulations but Preserve State Control Over*

*Social Issues*, 85 IOWA L. REV. 1, 21 (1999) citing WILLIAM W. CROSSKEY,

POLITICS AND THE CONSTITUTION IN THE HISTORY OF THE UNITED STATES, 84-96

---

[7] The second and less relevant definition is "aid in the form of money or
necessities."  *Supra*.

(1953).  Webster's first dictionary defines "commerce" as including trade as well as the "interchange of work" and "business".  NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (unpaginated ed. 1970) (1828); *see* Nelson and Pushaw, n.73. Federalists, including Alexander Hamilton, shared this understanding.  Nelson and Pushaw, 20, citing "Letter from Hamilton to Robert Morris" (1780), reprinted in THE WORKS OF ALEXANDER HAMILTON, (1904).  Some colonists employed the word "commerce" to include all transactions involving money, such as the buying and selling of property.  Nelson and Pushaw, 20-21.  Yet, like their English counterparts, these new Americans distinguished market-oriented "commerce" from the self-sufficient home economy.  *Supra*, citing THE FEDERALIST, No. 56, at 382.  None of these understandings of "commerce" include illicit activity, such as pimping, prostitution, running illegal taxi businesses, or hiring illegal immigrants.  Under the plain meaning of "commerce", the prosecution in this case has unconstitutionally applied the Hobbs Act to Mr. Kim because it is protecting illegal commerce.  *See, e.g., Bailey*, 516 U.S. at 144-45, which applied the ordinary and commonly understood meaning of a word when engaging in statutory construction.  The same approach to words applies to interpreting our Constitution.

The history and context in which the Commerce Clause was enacted further solidifies the interpretation that the purpose of the Commerce Clause was to

30

protect and enhance <u>legal</u> commerce .  The Framers of the Constitution intended the Commerce Clause to bestow on Congress the authority to prevent states from pursuing protectionist economic policies and to promote national commerce. Nelson and Pushaw, 21-22.  It was part of a systematic plan to resolve the economic crisis facing this country in the 1780s.  *Supra.*  The post-Revolutionary War break from England led to the loss of colonial subsidies and preferences. American enterprises that emerged during the War could not compete with the well-established European companies.  *Supra.*  Furthermore, Great Britain and others had hostile commercial policies toward the United States.  *Supra.*  The weak national government under the Articles of Confederation could not raise revenues to meet the rising debt.  *Supra.*  As a result, state governments filled the vacuum, and implemented harmful pro-debtor commercial policies.  *Supra* at 23.  States also engaged in economic warfare against one another, and border quarrels erupted.  *Supra.*  When the Constitutional Convention met in June 1787 to resolve these problems, the delegates agreed that the national government required enhanced commercial powers, and these discussions ultimately led to the implementation of the Commerce Clause.   *Supra* at 24-25.  The purpose of the Commerce Clause was to promote and protect legitimate, not illegal, interstate commerce.  The Commerce Clause and the Hobbs Act, as enabling legislation, is misapplied in Mr. Kim's case as to Mr. Chang, Mr. Kee Ho, and Mr. Moon.  The

31

Commonwealth of Virginia, not the federal government, is the proper jurisdiction

for the alleged crimes against these men.

If this Court overturns Mr. Kim's Hobbs Act convictions for Mr. Chang, Mr.

Kee Ho, and Mr. Moon, they would not be included as injured victims, vulnerable

victims, or persons entitled to restitution.  Excluding them means that Mr. Kim

would not be subject to an enhancement under §3A1.1(b)(1), since the regular

business, restaurants and flooring, are not vulnerable as that is defined by

Application Note 2 of Guideline § 3A1.1(b)(1).  Removing Mr. Moon as a victim

reduces Mr. Kim's Guidelines calculation because the court applied

§ 2B3.2(b)(4)(A) for Thunder slapping Mr. Moon in April 2011.  (JA 92, 99-100,

253, 275)  Lastly, the total restitution would be lowered from $12,100.00 to

$11,600.00.

### 2.    LIMITS OF THE COMMERCE CLAUSE:  *UNITED STATES V. LOPEZ.*

Consistent with the proposition that the Commerce Clause is not intended to

protect illegal interstate commerce, the Supreme Court has made it clear that

Congressional power under the Commerce Clause has limits.  In the landmark

Commerce Clause case, *United States v. Lopez*, 514 U.S. 549, 642-43 (1995), the

Supreme Court struck down the Gun-Free School Zones Act of 1990, which

prohibited any individual from knowingly possessing a firearm in a school zone.

The Court held that possession of a gun in a local school zone was too indirect an effect on interstate commerce. *Id.* The Supreme Court admitted that its prior cases gave great deference to Congressional use of the Commerce Clause, "but we decline here to proceed any further." *Id.* at 643. The Court's main concern was federalism, and that to allow expansion:

> [W]ould require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated […] and that there never will be a distinction between what is truly national and what is truly local […] this we are unwilling to do." *Id.* at 643.

In *Lopez*, the Court also identified the three broad categories of activity that Congress may regulate under its commerce power. Congress may regulate the use of the "channels" of interstate commerce, the "instrumentalities" of interstate commerce, as well as regulate those activities having a "substantial relation" to interstate commerce. *Id.* at 558. It was under the third category that the Court struck down the Act.[8] None of these categories included the protection of illegal commerce, which is what occurred in Mr. Kim's case.

The US Supreme Court in *Lopez* declared that there are limits under the Commerce Clause, and these limits must be applied to Mr. Kim's case. The federal government, in this case, used the Hobbs Act to protect prostitution, illegal

---

[8] In *United States v. Morrison*, 529 U.S. 598, 617-18 (2000) the Supreme Court again established that the Commerce Clause power has limits when it struck down the federal Violence Against Women Act because it did not have a substantial effect on interstate commerce.

gambling, and an illegal taxi business under the umbrella of the Commerce Clause. That is outside of the constitutional's limited grant of power to the National Government. In this case, the lower court went beyond its jurisdictional authority by going outside of the scope of the Commerce Clause to apply the Hobbs Act to protect illegal interstate criminal activity.

### E. THE HOBBS ACT WAS ENACTED TO COMBAT HIGHWAY ROBBERIES AND TO PROTECT LEGITIMATE INTERSTATE COMMERCE, NOT ILLEGAL INTERSTATE COMMERCE.

In addition to discerning the plain meaning of a statute, analyzing its legislative history is another method of interpretation. *See Griffin*, 458 U.S. at 572-74. Consistent with the purpose of the Commerce Clause, the legislative history of the Hobbs Act shows that it was not enacted to protect criminals engaged in illegal interstate commerce; it was enacted to solve the problem of highway robbery interfering with legitimate commerce. 18 U.S.C. § 1951(a).

The Hobbs Act was passed in 1945 as an amendment to the 1934 Anti-Racketeering Act and was a response to the Supreme Court's decision in *United States v. Local 807, Int'l Brotherhood of Teamsters*, 315 U.S. 521 (1942). Alexander M. Parker, *Stretching Rico to the Limit and Beyond*, Note, 45 DUKE L.J. 819, 822-23 (1996). In *Local 807*, the Supreme Court overturned the conviction of union members accused of using threats of violence to obtain wages for no labor, and Congress wanted to remove the labor union exemption from the 1934 Act.

34

*Supra.*

The sponsor of the amendment, Congressman Hobbs, argued that the purpose of the Act was to address highway robbery by organized labor unions and to protect individuals and goods in interstate commerce. Michael McGrail, *The Hobbs Act After Lopez*, Note, 41 B.C. L. REV. 949, 956-57 (2000), citing 91 CONG. REC. 11,912 (1945). Other testimony during House of Representatives debate affirms that the Hobbs Act was passed to protect people "trying to deliver food into the various big cities in our nation" and those "who feel they have a right to drive down . . . public highways and streets . . .". McGrail, 957, citing 91 CONG. REC. 11,908. Federal Judge DeMoss noted an important fact underpinning the Act when he wrote that, "Congress passed [the Hobbs Act] to combat highway robberies by labor union members which, at the <u>rate of more than 1,000 per day</u>, were having a considerable impact on interstate commerce." (emphasis added); *United States v. Hickman*, dissent, 179 F.3d 230, 244 (5th Cir. 1999). The Hobbs Act was a subject specific statute addressing the particular problem of highway robberies directly interfering with lawful interstate commerce. The purpose of the Act was not to protect criminals employing and transporting illegal immigrants to serve as prostitutes, which is exactly what occurred with Mr. Chang, Mr. Kee Ho, and Mr. Moon in this case. The police powers of the state, not the federal government, should have been the prosecuting authority for the

crimes against these criminal victims. To do otherwise undermines the sovereignty of the States. *Lopez, supra*., at 564.

### F. It is Unconstitutional under the Commerce Clause to Give Mandatory Restitution, Pursuant to the Hobbs Act, to Criminals for Money they Earned from Engaging in Illegal Activity.

Pursuant to 18 U.S.C. § 3663A(a)(1), the mandatory restitution provision, the court ordered Mr. Kim to repay Mr. Chang, Mr. Kee Ho, and Mr. Moon for being a part of a conspiracy that took their illegally earned money. (JA 119-123) For all of the same reasons discussed above, it is unconstitutional under the Commerce Clause for the government to order Mr. Kim to reimburse criminals for money they earned from their own criminal enterprises. (*See* Br., Part III, A-E). The federal government effectively aided and abetted criminal activity, in this case prostitution rings, when it ordered restitution to these three men. The purpose and meaning of the Constitutional Commerce Clause is to protect and enhance legal interstate commerce, not to exploit women, illegal gambling, or tax fraud. *See* Const. Art. I, Sec. 8; Nelson and Pushaw, *supra*, 21-25. It exceeds Congressional power to use the Commerce Clause to repay criminals the money they gained from illegal interstate business. The lower court, in supporting the federal protection of criminals by using the Hobbs Act, exceeded its jurisdiction.

## CONCLUSION

In this extortion case, the Hang Gang Restaurant, Honey Pig Restaurant, and Mr. Oh's flooring business, were all engaged in lawful business pursuits. Those lawful businesses are not vulnerable victims and do not support this enhancement, an enhancement for injury, or an enhancement for possession of a dangerous weapon. If the Hobbs Act, under the Commerce Clause power, cannot be used to protect criminal activity, then these three lawful businesses are the only victims. The three men engaged in criminal activities, Mr. Chang, Mr. Moon, and Mr. Kee Ho, would not be victims. That would affect the application of the enhancements the court applied to its Guideline calculations. Even if the Hobbs Act could not be applied to the three criminals, the enhancement for vulnerable victim and possession of a dangerous weapon still do not apply because the record does not support these enhancements.

This Court is asked to strike the three criminal victims from this case. The questioned enhancements should be stricken from the sentencing Guidelines calculation, and the case remanded for resentencing without those enhancements.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument on the issues presented in this appeal.

Respectfully submitted,


KWANG HEE KIM
By Counsel


_____/S/_____
MARVIN D. MILLER, ESQ.
Co- Counsel for Kwang Hee Kim
Law Offices of Marvin D. Miller
1203 Duke Street
Alexandria, VA 22314
Phone:  (703) 548-5000
Fax:  (703) 739-0179
katherine@marvinmilleratlaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This Brief of the Appellant has been prepared using Microsoft Word software, Times New Roman font, 14 point proportional type size.

2. Exclusive of the corporate disclosure statement; table of contents; table of authorities; statement with respect to oral argument, any addendum containing statutes, rules, or regulations; and the certificate of service, this brief contains 8,865 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word of line print-out.


/S/_____
MARVIN D. MILLER, ESQ.

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of June, 2013, true and correct copies

of the Brief of Appellant and of the Joint Appendix were filed with the Clerk, U.S.

Court of Appeals via hand delivery and electronically using the Court's CM/ECF

system which will send notification of such filing to:

 Marc Birnbaum,
Assistant United States Attorney,
 Office of the United States Attorney,
2100 Jamieson Avenue,
Alexandria, Virginia 22314
marc.birnbaum@usdoj.gov

/S/_____
MARVIN D. MILLER, ESQ.
Counsel for Kwang Hee Kim